

649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
(602) 382-4078

Kory Langhofer, Ariz. Bar No. 024722
kory@statecraftlaw.com
Thomas Basile, Ariz. Bar. No. 031150
tom@statecraftlaw.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Living United for Change in Arizona (LUCHA), *et al.*, | No. 2:26-cv-02320-SMB |
| Plaintiffs, | |
| v. | |
| Warren Petersen, *et al.*, | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION** |
| Defendants. | |

Defendants Warren Petersen, in his official capacity as the President of the Arizona State Senate, and Steve Montenegro, in his official capacity as the Speaker of the Arizona House of Representatives (together, the "Legislative Leaders"), respectfully submit this response in opposition to the Plaintiffs' Motion for Preliminary and Permanent Injunction.

**INTRODUCTION**

The First Amendment grants no dispensation to hijack legislative proceedings with dyspeptic outbursts, churlish disruptions, or performative displays of pique. The Arizona State Capitol is a place of government business. The Legislature has always opened its doors to members of the public who wish to observe or comment on its work. But the institution's effective and efficient functioning requires that expressive activities respect strictures that uphold decorum, maintain order, and facilitate structured deliberation and debate. To these ends, Arizona law prohibits "any disorderly conduct in the immediate view and presence of either house, tending to interrupt its proceedings or impair the respect due its authority." A.R.S. § 41-1221(B). Longstanding regulations likewise ban on the Capitol grounds conduct that is disruptive to government operations, including unsanctioned sound amplifications. *See* Exhibit 1.

The Plaintiffs proved unwilling to align their behavior with these basic maxims of civility, opting instead to subvert legislative proceedings with screeching, whistles, and a bullhorn. Rather than accept responsibility—and the attendant consequence of a temporary (and now effectively expired) ban from committee hearings for the remainder of this legislative session—for their choices, the Plaintiffs cast around for a scapegoat, imputing to the Legislative Leaders animus towards their ostensible "viewpoint" and—especially odiously—their ethnic background.

These anemic smokescreens dissipate under the weight of the actual facts. The Plaintiffs were temporarily excluded from committee hearings solely because of their behavior. Footage of the relevant committee hearings proves conclusively that the sole common element differentiating the Plaintiffs from other attendees was the Plaintiffs' refusal to conform themselves to neutral and generally applicable rubrics of orderly conduct.

Numerous other citizens who shared the Plaintiffs' opposition to certain bills were permitted to freely express the same perspective in accordance with the institution's rules. Conversely, none of the bills' supporters engaged in comparable disorderly behavior.

In any event, the Court need not embark on factfinding or parse the nuances of the Plaintiffs' various constitutional theories. Because maintaining order and enforcing general rules of conduct are integral to the effective functioning of legislative institutions, the Legislative Leaders are absolutely immune from this suit.

<strong>FACTUAL BACKGROUND</strong>

## I.      Senate Building

It is undisputed that, on January 26, 2026, Plaintiffs Alvarez and Mendez attended a hearing of the Senate Military Affairs & Border Security Committee. Compl. ¶ 18. Confusingly, the Complaint alleges that the hearing pertained to Senate Bill 1570, which Plaintiffs describe as relating to "discriminat[ion]" in state employment. *Id.* ¶ 19. In fact, the legislation under consideration was Senate Bill 1055, which would require state and local law enforcement to notify U.S. Immigrations and Custom Enforcement upon arresting an illegal alien. In any event, in the Plaintiffs' conveniently sanitized rendition of the facts, they "expressed their viewpoint . . . in opposition to the bill." *Id.* ¶ 20. As video of the hearing confirms, Alvarez and Mendez's "expression" of a "viewpoint" actually was a cacophony of whistles and screaming that derailed the committee proceedings until they were escorted out of the room.[1]

On February 18, 2026, Plaintiffs Serafin, Saldana, Ramon, Ramos, Patino, and Parades attended the Judiciary & Elections Committee hearing on Senate Bill 1635, which would generally prohibit alerting another individual to his or her impending arrest with the intent of hindering that arrest. The Chair announced at the outset of the hearing—which would run for more than five hours and featured an agenda containing more than 50 items—

---

[1] Hearing of Ariz. Senate Military & Border Affairs Comm. (Jan. 26, 2026), *available at* https://www.azleg.gov/videoplayer/?eventID=2026011062 (beginning at 55:00).

that supporters and opponents each could designate an equal number of speakers to articulate their side's perspective on each bill, and that every speaker would be allotted 90 seconds.  She also reminded all attendees to "hold[] decorum and respect[] the institution."[2] The overwhelming majority of participants across the political spectrum heeded these basic and neutral ground rules.  The Plaintiffs, however, chose another course, and launched a caterwauling chant that obstructed the committee's work and forced a recess.[3]

Senate Sergeant at Arms Joseph Kubacki issued notices to each of the Plaintiffs that they were formally trespassed from the Senate building for the duration of the legislative session.  Compl. ¶¶ 25–26.  Although the notices admittedly did not specify this distinction, they were intended only to preclude the Plaintiffs from entering legislative committee proceedings—not necessarily to ban the Plaintiffs from entering the building for other purposes, such as one-on-one appointments with particular senators.  *See* Kubacki Decl. ¶¶ 10–11.  Indeed, on April 15, 2026 one of the Plaintiffs entered the Senate building as a guest of Senator Miranda.  At the direction of the Chief of Staff, she was permitted to remain in the building, as long as she did not cause any disruptions.  *Id.* ¶¶ 12.

The Legislature's internal deadline for completing committee hearings for the current legislative session is May 1, 2026.

## II.    House Building

Alvarez alleges that a House security agent ejected him from the premises because of what the Complaint describes in anodyne terms as "activities that Alvarez engaged in outside of the building."  Compl. ¶ 30.  In fact, these "outside" "activities" consisted of bellowing through a bullhorn—just inches from a legislator's head—on a sidewalk immediately outside the Capitol.  *See* Exhibit 2 (Incident Report prepared by House security).  Longstanding regulations provide that "any civic activities on Capitol grounds "must be conducted in a manner that minimizes damage to State property and facilities,

---

[2] Hearing of the Ariz. Senate Judiciary & Elections Comm. (Feb. 18, 2026), *available at* https://www.azleg.gov/videoplayer/?eventID=2026021102 (beginning at 00:01:03).

[3] *See* https://www.azleg.gov/videoplayer/?eventID=2026021102 (beginning at 4:34:00).

3

protects members of the general public and minimizes disruption of government operation . . . . Sound may be amplified only on the House lawn or Senate lawn, and only pursuant to an approved Event Application." *See* Exh. 1. Alvarez is not currently subject to any active, ongoing ban from the House building.

ARGUMENT

**I.      The Legislative Leaders Are Absolutely Immune From Plaintiffs' Claims**

   **A.      Overview of Federal Immunity for State Legislators**

"[S]tate and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998). Article I, Section 6 of the U.S. Constitution immunizes Members of Congress from being "questioned in any other Place" regarding "any Speech or Debate in either House." The Supreme Court has "broadly construed that protection" to mean that "[c]ongressmen and their aides are immune from liability for their actions within the legislative sphere, even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 510 (1975) (citations omitted); *see also United States v. Helstoski*, 442 U.S. 477, 489 (1979) ("The [Speech or Debate] Clause protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts.'" (citation omitted)); *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (explaining that "[t]he Clause reflects the Founders' belief in legislative independence" and "provides absolute immunity from civil suit"). Legislative immunity serves "to prevent distraction from legislative duties, obstruction of ongoing legislative activity, or the burden of defense from civil liability." *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 528 (9th Cir. 1983).

The Speech or Debate Clause does not, by its own terms, apply to state legislators. But the rationales that animate it transcend the federal sphere and permeate the constitutional structures of state governments, including Arizona's. *See* Ariz. Const. art. IV, pt. 2, § 7 (securing parallel immunity for Arizona state legislators); *Mesnard v.*

4

*Campagnolo in and for Cnty. of Maricopa*, 489 P.3d 1189, 1193 (Ariz. 2021) (holding that, like its federal counterpart, Arizona's Speech or Debate Clause "prevents legislators, their aides, and their contractors from being criminally prosecuted or held civilly liable for their legislative activities"). Observing the legislative immunity's entrenchment in Anglo-American law, the U.S. Supreme Court held that when Congress enacted 42 U.S.C. § 1983, which allows individuals to vindicate federally protected rights against persons acting under color of state law, it did not abrogate state legislators' historical immunities. *See Tenney v. Brandhove*, 341 U.S. 367, 376–77 (1951) ("We cannot believe that Congress—itself a staunch advocate of legislative freedom—would impinge on a tradition so well grounded in history and reason by covert inclusion in the general [statutory] language before us."). Accordingly, the Speech or Debate Clause remains the conceptual fount of "analogous protections for state legislators under federal common law," and they, "like members of Congress, enjoy protection from criminal, civil, or evidentiary process that interferes with their 'legitimate legislative activity.'" *Puente Arizona v. Arpaio*, 314 F.R.D. 664, 669 (D. Ariz. 2016) (citing *Tenney*, 341 U.S. at 376).

Two particular attributes of this immunity merit emphasis. First, it is not confined only to civil suits for monetary damages; it "is equally applicable to § 1983 actions seeking declaratory or injunctive relief." *Supreme Court of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 732 (1980) (holding that state supreme court judges were immune when acting in a legislative capacity); *see also Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 959 (9th Cir. 2010) (acknowledging that the federal common law legislative immunity "extends both to claims for damages and claims for injunctive relief"). Second, when the immunity is properly invoked, it is "absolute," *Bogan*, 523 U.S. at 49. In that respect, it is distinguishable from state legislators' attendant federal common law *privilege* against compelled disclosures, which in limited circumstances can be overcome by countervailing considerations. *See generally Mi Familia Vota v. Hobbs*, 682 F. Supp. 3d 769, 777–78 (D. Ariz. 2023) (summarizing the differences between the immunity and the privilege). It likewise is distinct from the qualified immunity that sometimes is invoked by officials

5

responsible for enforcing state laws when they are sued in their personal capacities (usually for damages) under Section 1983's auspices. *See Cmty. House*, 623 F.3d at 964 ("In § 1983 actions, the doctrine of qualified immunity protects . . . officials from personal liability in their *individual* capacities for their official conduct so long as that conduct is objectively reasonable and does not violate clearly-established federal rights."). In short, legislative immunity is absolute (not qualified) and insulates the Legislative Leaders from liability in any form (injunctive or monetary) and in any capacity (official or personal).[4]

### B. Maintaining Order and Security During Legislative Proceedings Is a Legislative Function

Because the Legislature's internal regulations governing access to, and conduct within, its walls are integral to the institution's functions, the temporary ban on Plaintiffs' access to committee hearings is an immune legislative act. Legislative immunity envelopes all actions and decisions that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972). The Supreme Court has imputed to this concept "a practical meaning, extending the subject matter protected to cover activity that is within the 'legitimate legislative sphere.'" *Miller*, 709 F.3d at 529. The immunity is "read broadly to effectuate its purposes," *United States v. Johnson*, 383 U.S. 169, 180 (1966), and "[t]he legislative process at the least includes 'delivering an opinion, uttering a speech, or haranguing in debate; proposing legislation; voting on legislation making, publishing, presenting, and using legislative reports; authorizing investigations and issuing subpoenas; and holding hearings and "introducing material at Committee hearings." *Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 10–11 (D.C. Cir. 2006).

---

[4] In crucial contrast, then-Senator Pearce asserted only qualified immunity in *Reza v. Pearce*, 806 F.3d 497 (9th Cir. 2015). The *Reza* court accordingly had no occasion to opine on the applicability of the absolute legislative immunity.

At least three circuits have agreed that regulating access to, and conduct within, legislative chambers is integral to the legislative process.  A half century ago, the D.C. Circuit held that an association acting under the Speaker of the House's supervision was immune from claims that it violated the First Amendment by withholding credentials to the chamber's press gallery, explaining that Congress historically has "controlled the seating of the press within its halls." *Consumers Union of the U.S., Inc. v. Periodical Correspondents' Ass'n.*, 515 F.2d 1341, 1350 (D.C. Cir. 1975).  Agreeing that "a legislature's House [is] its castle," the First Circuit barred a constitutional challenge to a state legislature's rules banning certain lobbyists from the house floor, reasoning that "[a] rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials . . . in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity."  *Nat'l. Ass'n. of Social Workers v. Harwood*, 69 F.3d 622, 632 (1st Cir. 1995).  Finally, in a case that bears parallels to this one, the Tenth Circuit recently sustained an immunity defense to a suit challenging the Colorado Legislature's ejection of advocates who violated internal rules against "misgendering" during their committee testimony.  *See Gays Against Groomers v. Garcia*, 169 F.4th 981, 997–98 (10th Cir. 2026) (holding that the adoption of rules limiting speech in committee proceedings "were integral steps in the legislative process," and "[i]t follows, as night the day, that in the circumstances here, the Legislators' enforcement of the committees' rules was also a quintessential legislative activity").

In sum, the establishment of rules cabining the permissible contours of conduct inside the Capitol is critical to the effective functioning of the legislative process.  Because parchment directives necessitate practical enforcement, the Plaintiffs' temporary exclusion from committee hearings is, under the circumstances, likewise an immune legislative act.

### C.   Alternatively, the Defendants Have Qualified Immunity in Their Personal Capacities

Even if the Court deems legislative immunity inapplicable, the Legislative Leaders retain qualified immunity from damages in their personal capacities.  "The doctrine of

7

qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citations omitted). Stated another way, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* Crucially, courts cannot "define clearly established law at a high level of generality," and any precedent invoked to overcome the immunity must govern "the particular circumstances that [the defendant] faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014).

Assuming *arguendo* that any Plaintiff's constitutional rights were ever infringed, the Legislative Leaders' actions to shield legislators and other Capitol visitors from Plaintiffs' gratuitous obstruction of legislative proceedings did not collide with any clearly established law. To the extent it applies it all, *Reza* is distinguishable in at least two key respects. First, there is no reasonable dispute that the Plaintiffs did, in fact, knowingly engage in conduct that directly and substantially thwarted ongoing legislative work. *Contrast Reza*, 806 F.3d at 504 (citing conflicting evidence regarding whether the plaintiff behaved disruptively). Second, Plaintiffs are not barred from accessing the Capitol for purposes unrelated to committee hearings, such as meetings with specific legislators. *See* Kubacki Decl. ¶¶ 10–12; *contrast Reza*, 806 F.3d at 505 (finding that plaintiff was "prevented . . . from meeting with an elected senator"). And with respect to the House building, no notice of trespass was ever issued and no open-ended ban on access is in place. In short, *Reza* is "simply too factually distinct to speak clearly to the specific circumstances here." *Mullenix v. Luna*, 577 U.S. 7, 18 (2015).

**II.     The Plaintiffs' First and Fourteenth Amendment Claims Are Not Viable**

"A plaintiff seeking a preliminary injunction must establish that he is likely to

8

succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Plaintiffs' smorgasbord of First Amendment and Fourteenth Amendment theories runs headlong into the facts, which demonstrate that the Plaintiffs' expulsions were solely and entirely the foreseeable consequence of their puerile behavior. Indeed, in some instances, the Plaintiffs' claims even as pleaded "stop[] short of the line" demarcating a "plausible" (and thus actionable) entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

### A.    A Short-Term Ban from Committee Hearings for Disruptive Behavior Is a Reasonable Restriction in a Limited Public Forum [Count 1]

The Plaintiffs' temporary exclusion from committee hearings was reasonable and proportionate to the Legislature's legitimate interests in orderly proceedings, and still enabled at least one Plaintiff to access the Senate building for other purposes.

The government enjoys wide latitude in prescribing the terms of access to limited public fora, such as the Arizona State Capitol. *See Reza*, 806 F.3d at 503 (holding that the Senate building is a "limited public forum"); *see also* 16A AM. JUR. 2D CONSTITUTIONAL LAW § 542 ("[A] limited public forum has the least protection under the First Amendment."). A limited public forum is "characterized by selective access based on the speaker or subject matter. In this type of forum, the government may regulate speech so long as the restriction is [1] reasonable and [2] viewpoint neutral." *Koala v. Khosla*, 931 F.3d 887 900 (9th Cir. 2019) (citation omitted); *see also Perry Educ. Ass'n.v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 48 (1983) (explaining that, in a limited public forum, "the constitutional right of access would in any event extend only to other entities of a similar character"). The viewpoint neutral nature and application of the prohibitions on disruptive behavior during legislative proceedings are discussed below in connection with Plaintiff's Count 2. The Legislative Leaders accordingly will here address the reasonableness of these limitations and the Plaintiffs' temporary exclusion from hearings.

9

The "reasonableness" rubric "focuses on whether the exclusion is consistent with 'limiting the forum to activities compatible with the intended purpose of the property,'" and examines whether "exclusions [are] based on a standard that is definite and objective." *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 499 (9th Cir. 2015). Such "[l]imitations on expressive activity" in limited public fora "must survive only a much more limited review." *Int'l Soc'y. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992). Unsurprisingly, "[r]estrictions on speech that will foreseeably disrupt the intended function of government property have generally been held reasonable in limited public forums." *Seattle Mideast*, 781 F.3d at 500. A.R.S. § 41-1221 aligns squarely with this principle by banning "disorderly conduct in the immediate view and presence of either house, tending to interrupt its proceedings or impair the respect due its authority." These are not esoteric concepts; they are the foundational precepts instilled in kindergarten classes: wait your turn to speak, do not shout, and do not interrupt when others are talking.

The Plaintiffs' limited duration ban from committee proceedings likewise was a reasonable restriction on their access to the forum. "[T]he Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 810 (1985); *see also Koala*, 931 F.3d at 900 n.6 (explaining that the distinction between limited public forums and nonpublic forums "doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums."). Accordingly, the government may preemptively limit "[a]ny speech that will foreseeably result in harm to, disruption of, or interference with" the forum's intended functioning. *Seattle Mideast*, 781 F.3d at 500.

Here, it is beyond reasonable dispute that the Plaintiffs did, in fact, knowingly derail committee proceedings by engaging in shouting, chanting, and whistle-blowing for the specific purpose of interrupting the committee's work.[5] *Contrast Reza*, 806 F.3d at 504 (citing factual dispute regarding whether expelled individual actually engaged in disruptive

---

[5] The Complaint vaguely avers that "some but not all of the Plaintiffs" engaged in the ructions, but does not identify which Plaintiffs supposedly were blameless. Compl. ¶ 39.

conduct). The Defendants could permissibly preempt similar future shenanigans. When one of the Plaintiffs entered the Capitol for a scheduled meeting with a specific senator, by contrast, she was allowed to remain. Kubacki Decl. ¶ 12; *contrast Reza*, 806 F.3d at 505. A temporary exclusion of the Plaintiffs from committee hearings was a proportionate and tailored response to the foreseeable risk that they would imminently cause future disruptions if they were immediately readmitted to the Capitol. *See Krishna Lunch of S. Cal., Inc. v. Beck*, 651 F. Supp. 3d 1165, 1176 (C.D. Cal. 2023) ("A prior restraint in a limited public forum need only be reasonable and viewpoint neutral."), *aff'd*, 2023 WL 6157398 (9th Cir. Sept. 21, 2023).

Similarly, Plaintiff Alvarez was refused admission to the House building on one occasion because he had violated a longstanding, neutral, and generally applicable prohibition on the use of unapproved sound amplification devices on Capitol premises. *See* Exh. 1. The Legislative Leaders are not aware of any extant, ongoing blanket ban of Alvarez or any other Plaintiff from the House building.

## B.   Generally Applicable Prohibitions on Disruptions of Legislative Proceedings Are Viewpoint Neutral [Count 2]

"[V]iewpoint discrimination occurs when the government prohibits 'speech by particular speakers,' thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (citation omitted). The Plaintiffs cannot (and it appears they do not) credibly contend that either A.R.S. § 41-1221 or the State Capitol Grounds Regulations are, on their face, skewed to favor any particular viewpoint. It follows that their presumably as-applied theory of viewpoint discrimination "requires evidence that the government intended to 'suppress expression merely because public officials oppose the speaker's view.'" *Seattle Mideast*, 781 F.3d at 502 (quoting *Perry*, 460 U.S. at 46).

There is zero evidence—and the Plaintiffs indeed have pleaded no factually plausible claim—that Plaintiffs were removed from the committee hearings and issued trespass notices because of the beliefs or opinions they espouse. Discerning actual viewpoint discrimination necessarily requires disentangling confounding viewpoint-neutral variables

11

that may independently explain a plaintiff's alleged adverse treatment under the law.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if has an incidental effect on some speakers or messages but not others."); *Boardman v. Inslee*, 978 F.3d 1092, 1113 (9th Cir. 2020) ("[A] law affecting entities holding a particular viewpoint is not viewpoint discriminatory unless it targets those entities *because of* their viewpoint.")).

Here, the common denominator distinguishing the Plaintiffs from similarly situated individuals who were not removed or trespassed was not their beliefs, but their behavior. *See Christian Legal Soc'y. Chapter of the Univ. of Cal., Hastings College of the Law v. Martinez*, 561 U.S. 661, 696 (2010) (finding no viewpoint discrimination, reasoning that it was the plaintiff's "conduct—not its Christian perspective" that explained its alleged adverse treatment); *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995) (finding no First Amendment violation where plaintiff had been ejected from public meeting after "disrupting the proceedings by yelling and trying to speak when it was not time");  *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1277–78 (9th Cir. 2017) (finding no viewpoint discrimination because challenged ordinance "regulates [plaintiffs] because they engage in false or misleading speech, irrespective of their viewpoints."); *Menotti v. City of Seattle*, 409 F.3d 1113, 1130 (9th Cir. 2005) (finding no viewpoint discrimination where shoppers and workers but not protesters were permitted to enter a certain area, noting that "there is no evidence that those persons who were permitted to enter the restricted zone were part of the security problem that prompted the adoption of" the restrictions).

A review of the hearing footage proves that numerous other speakers shared the Plaintiffs' perspectives on the legislation under discussion.  These individuals articulated their opinions within the allotted time, and the committee listened respectfully.  Similarly, none of the Plaintiffs' ideological opponents engaged in raucous activity comparable to Plaintiffs' chanting, whistling and shouting.  *Contrast Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1143 (D.C. Cir. 2023) (finding viewpoint discrimination when "[t]he police arrested the [plaintiff's] members when they chalked their message on

the sidewalk, while allowing other speakers to mark their messages on sidewalks and other public places"). As Mr. Kubacki's declaration confirms, the Plaintiffs' removal from the Capitol and subsequent trespass notices were predicated solely and entirely on their objectively disruptive behavior, not their subjective beliefs. *See* Kubacki Decl. ¶¶ 13–15.

### C. Plaintiffs Have Failed to State Freestanding Claims Under the Petition Clause and Association Clause [Counts 3 and 4]

Plaintiffs' theories under the First Amendment's rights of petition and association appear to be entirely derivative of, and coterminous with, their Speech Clause claims, and thus are inviable for the same reasons. To be sure, the Association Clause and Petition Clause may in some circumstances afford protections that elude the Speech Clause. But the Plaintiffs here have not developed any facts or legal arguments that are unique to the rights of speech or petition. They cannot resurrect their moribund Speech Clause claims merely by swapping out labels. *See Christian Legal Soc'y*, 561 U.S. at 681 ("When these intertwined rights arise in exactly the same context, it would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association."); *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 393 (2011) (holding that party "should not be able to evade" an adverse Speech Clause precedent "by wrapping their speech in the mantle of the Petition Clause"); *Ams. for Prosperity v. Meyer*, 724 F. Supp. 3d 858, 868 n.9 (D. Ariz. 2024) (noting that "existing authority indicates there is substantial, if not complete, overlap between the reach of free speech rights and the right to petition for redress of grievances").

### D. Alvarez Did Not Suffer "Retaliation" for Constitutionally Protected Speech [Count 5]

Alvarez was denied entry to the House solely because he violated neutral, generally applicable, and longstanding noise-control regulations on Capitol premises. Retaliation claims are vulnerable to the reductionist reasoning that when an adverse government action occurred after a plaintiff's expressive activities, the latter *ipso facto* caused the former. To guard against that fallacy, courts require that plaintiffs claiming retaliation to demonstrate

13

that "the protected activity was a substantial motivating factor in the defendant's conduct— i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 867 (9th Cir. 2016); *see also Houston Cmty. College Sys. v. Wilson*, 595 U.S. 468, 477 (2022) (plaintiff must prove "that the government took an 'adverse action' in response to his speech that 'would not have been taken absent the retaliatory motive'" (citation omitted)).

The crux of Alvarez's "retaliation" claim is that he "was banned from the [House] building for his activities outside of the building." Compl. ¶ 90. Tellingly, the Complaint pleads no facts delineating these "activities" or establishing that they fell within the First Amendment's ambit. *See generally Landers v. Quality Commc'ns., Inc.*, 771 F.3d 638, 641 (9th Cir. 2014) ("[A] complaint that offers 'labels and conclusions . . . a formulaic recitation of the elements of a cause of action,' or 'naked assertions' devoid of 'further factual enhancement' will not suffice." (quoting *Twombly*, 550 U.S. at 555, 557)). The incident to which Alvarez is alluding seems to be his decision to yell through a bullhorn near a Capitol walkway, while standing in close proximity to a House member's head, during the Legislature's working hours. That contravened preexisting regulations that prohibit the use of unapproved sound amplifying devices on the Capitol grounds. *See* Exh. 1. Alvarez has presented no evidence to refute the obvious explanation that his obnoxious and unlawful behavior—rather than whatever message he was yelling through the bullhorn (assuming it was even intelligible and coherent to listeners)—was the substantial motivating factor behind the alleged denial of entry. *See Davison v. Rose*, 19 F.4th 626, 637 (4th Cir. 2021) (rejecting retaliation claim because plaintiff "has not sufficiently provided evidence to prove that the no-trespass ban was issued because of his protected speech, as opposed to his threats and antagonistic behavior"); *see also Moss v. U.S. Secret Service*, 572 F.3d 962, 972 (9th Cir. 2009) ("The factual content contained within the complaint does not allow us to reasonably infer that the [defendants] ordered the relocation of Plaintiffs' demonstration because of its [political] message.").

14

**E.    Plaintiffs' Racial and Ethnic Backgrounds Were and Are Irrelevant [Count 6]**

To posit that elected legislators harbor animus towards certain racial or ethnic groups is to "declar[e] that the legislature engaged in 'offensive and demeaning' conduct." *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 11 (2024). Litigants and courts "should not be quick to hurl such accusations at the political branches." *Id.* For similar reasons, Supreme Court precedents "delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).

Unencumbered by a due regard for the facts necessary to responsibly sustain such grave accusations, Plaintiffs insouciantly proclaim that the Defendants acted with "discriminatory intent against [a] Latino/pro-immigrant group." Compl. ¶ 97. The support undergirding this inflammatory accusation? A one-sentence boilerplate sentence that "White people who engaged in the same or similar activities that Plaintiffs are alleged to have engaged in were not barred from the building." *Id.* ¶ 96. But "[t]hese bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim . . . As such, the allegations are conclusory and not entitled to be assumed true." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009) (citations omitted). The Complaint proffers no facts that (for example) identify these "White people," describe what expressive activities they were or were not undertaking, or detail what criteria the Plaintiffs used to profile these unnamed individuals' supposed racial and ethnic backgrounds. The "unadorned, the-defendant-unlawfully-harmed-me accusation," *id.* at 678, encapsulated in Count 6 could not survive a motion to dismiss, let alone justify the "extraordinary remedy," *Winter*, 555 U.S. at 22, of a preliminary injunction.

**F.    Plaintiffs Were Not Denied Any Constitutionally Required "Due Process" [Count 7]**

"A procedural due process claim has two distinct elements: (1) a deprivation of a

15

constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017) (citation omitted). "[T]he scope of procedural due process protections varies depending on the circumstances," and courts weigh (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Lachcik v. Maricopa Cnty. Bd. of Comm'rs.*, 2017 WL 633146, at *3 (D. Ariz. Feb. 16, 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

Here, the risk of an "erroneous deprivation" of any purported liberty interest in accessing the Capitol is non-existent. The Complaint seemingly does not dispute that the Plaintiffs engaged in conduct prohibited by A.R.S. § 41-1221. *See Dixon v. Love*, 431 U.S. 105, 113–14 (1977) ("Since appellee does not dispute the factual basis for the Secretary's decision, he is really asserting the right to appear in person only to argue that the Secretary should show leniency and depart from his own regulations. Such an appearance might make the licensee feel that he has received more personal attention, but it would not serve to protect any substantive rights."). Plaintiffs also do not argue that the statute fails to supply sufficiently clear and definite notice of its scope in relation to Plaintiffs' conduct. *See TGP Commc'ns. LLC v. Sellers*, 642 F. Supp. 3d 957, 966 (D. Ariz. 2022) (rejecting procedural due process claim in connection with denial of press credential, noting that "[t]he County published the standards by which it considers press-pass applications").

Although the Legislature does not maintain any particular, formalized process for challenging removals from the premises or suspensions of access, none of the Plaintiffs has (as far as the Defendants are aware) sought any such review. To the contrary, when one of the Plaintiffs accessed the Senate building for a meeting with a legislator, she was allowed to remain. *See* Kubacki Decl. ¶ 12; *see also Spears v. Ariz. Bd. of Regents*, 372 F. Supp. 3d 893, 916 (D. Ariz. 2019) (finding no procedural due process violation where activist was ejected after persisting to use a prohibited sound amplification device on university

16

property). And elaborate, quasi-judicial procedures are neither practicable nor useful in navigating case-by-case security determinations, particularly given the large inflows of visitors to the Capitol during the legislative session. *See Associated Press v. Budowich*, 780 F. Supp. 3d 32, 59 (D.D.C. 2025) ("[T]he Court doubts that . . . written notice-and-appeal rights for permanent hard [press] passes map neatly onto potential daily decisions about admittance into the Oval Office and limited access events.").

## III.    No Equitable or Public Policy Reason Justifies a Preliminary Injunction

None of the remaining *Winter* factors weighs in Plaintiffs' favor. The Senate's trespass notice was enforced only with respect to entry into committee hearings, and all committee proceedings for the current legislative session ended on May 1. Further, Plaintiff Alvarez is not under any active, ongoing ban from the House building (and the Complaint pleads no facts inconsistent with that reality). Unless Plaintiffs are averring that they intend to commit another criminal offense, *see* A.R.S. § 41-1221, they have demonstrated no plausible prospect of imminent harm, let alone that such an injury is "likely" to occur. *See Winter*, 555 U.S. at 22 (plaintiffs must show more than just the "possibility" of a future injury); 42 AM. JUR. 2D INJUNCTIONS § 35 ("To show irreparable harm, a party seeking injunctive relief must demonstrate some danger of recurrent violations of his or her legal rights."). On the other side of the ledger, there is a substantial and diffuse public interest in sustaining legislative officers' ability to "protect themselves and the [Capitol] facility from attack and disruption." *Dickinson v. Trump*, -- F.4th --, 2026 WL 1133353, at *11 (9th Cir. Apr. 27, 2026).

## CONCLUSION

The Court should deny the motion and dismiss Plaintiffs' claims on legislative immunity grounds.

17

RESPECTFULLY SUBMITTED this 1st day of May, 2026.


STATECRAFT PLLC


By:     */s/Thomas Basile*
          Kory Langhofer
          Thomas Basile
          649 North Fourth Avenue, First Floor
          Phoenix, Arizona 85003

*Attorneys for Defendants*


**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of May, 2026, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.


*/s/ Thomas Basile*

18